UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ARTHUR WOODS,

                    Petitioner,           **No. 03-CV-0572(VEB)**
          -vs-                            **DECISION AND ORDER**

BRIAN FISHER, Superintendent, Sing
Sing Correctional Facility,

                    Respondent.
_____

## I.      Introduction

*Pro se* petitioner Arthur Woods ("Woods" or "petitioner") has filed a petition for a writ

of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction, following a jury trial,

on one count of first degree robbery, two counts of second degree robbery, and one count of

endangering the welfare of a child.  The parties have consented to disposition of the matter by a

magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

## II.     Factual Background

On November 22, 1996, Larry Little, Veronica Kim Purks, and Little's six-year-old

grandson, Rondel Little, were returning home from dinner at about 6:00 p.m. and going up the

stairs to the porch at their house on Gerard Street in Buffalo. T. 38, 68, 136.[1] As Little was

unlocking the door, someone called out "hey, Larry," and they turned around and saw four men.

T. 40-41, 137-138. The men were black and were wearing hooded jackets. One of the men yelled,

"get down, Larry, get down," and then they beat and kicked him. T.45, 139. Little testified that

---

[1]        Citations to "T.___" refer to pages of the trial transcript.

every time he tried to look up he would get "smashed in the head . . . kicked in the side or stomped ." T. 54. After the robbery, Little's face "was swollen and he could hardly breath [sic]." T.145.

The "other guy, the one that snatched [Purks'] jewelry and threatened [their] grandson, he was down on his knees going through Larry's pockets and they took Larry's jewelry off of him." T. 40-42, 51, 57, 138-139. Little and Purks recalled that petitioner kept saying "get the money, get the money" and "spin that kid around and they'll tell where it's at." T.52, 56. After the robbers had taken their belongings, said that man said, "look where I got you at now, the great Larry Little, look where you at now, you're down on the concrete." T.45, 140. Purks testified this man's voice "was very familiar" and after the robbery, she "did put the voice to who it was." Little testified that he recognized the voice of the man who said this as Woods, whose voice he had heard "numbers [sic] of time [sic]" before." T.46, 50, 59.

Little knew Woods' parents before he (Woods) was born; Little had known Woods "all his life." Woods used to come over to his house "all the time" and also had lived with Little's wife when she was alive. T.47, 124. Purks testified that petitioner's mother was her maid, and Woods used to come pick her up; Woods would come over to their house and talk to Little, and he gave their grandson a dog. T.142. Woods was "friendly" with them and Purks considered him part of the family. T.142.

The robbers took cash and jewelry from Little and stole jewelry from Burks. T. 45, 139. Petitioner threatened to kill their grandson if Purks and Larry Little did not cooperate. T. 138. Petitioner took more than $400, a diamond bracelet, a watch with diamonds, and two rings. T. 53. All four assailants then fled toward Roebling Street to a waiting automobile. T. 188-189.

Abraham Plenty, who was on his way over to Little's house, saw three men running toward a car. He recognized one of these men as petitioner. It was dark out, but there was a street light by where he saw the car. T.200. Boobie was about 50 feet away from him. T.200. Plenty had known Boobie for about twenty-some years. T.186. Plenty was walking down the street from work and saw three men running to a car; he recognized one as Woods and called out, "hey, Boobie, what's up, and they jumped in the car and they pulled off." T.188. Woods did not respond to Plenty's greeting. *Id.* Plenty testified that he saw petitioner's his face at the time. T.189.

Continuing on to Little's home, Plenty found Little lying on the ground, "clothes all messed up . . . looked like he was in a lot of pain." T.190.; Purks and Rondel were in tears. T.190. Purks informed Plenty that they had been robbed. T.191. Plenty "was kind of shocked because [he] had seen Boobie" and he knew that Boobie was "Supposed to be his nephew, so [he] said, you know, Boobie did that." T.191.

Little testified that after the incident he "found out who it was," meaning that he "knowed it was [petitioner] when Abraham Plenty come around the corner" and said that he saw "Boobie running down the street . . . ." . T.119,120. Purks testified that after she talked to Plenty and "put[ ] the voice and the basic body description" together, she "knew who it was" who robbed them. T.144. Little didn't tell the police because he "was going to try to get [his] stuff back." T.119, 122-23.

Little testified that he told the police that he had gotten robbed, but he "didn't know for sure who it was" and he "couldn't think at that time," but he "was still remembering that voice, that distinction [sic] voice." T.59. Little testified that Woods had called their house several times

and made threats, frightening his girlfriend, Purks. Little testified Woods also came to their house with two other men and said, "you saying I robbed you. . . . you don't know who robbed you . . . but every time I see you from now on out I'm going to rob you." T.60.

Little and Purks testified that they did not call the police to report the robbery because they wished to settle the matter privately with petitioner and also because they were afraid of petitioner. P. 78, 80, 101-03, 124-25, 146, 161, 173, 184. Purks testified that they had tried to talk to Woods; they also talked to his mother, his uncle, and his brother, and other mutual acquaintances to try to resolve the matter; Purks was afraid Woods might come to their house because he had been calling them on the phone. T.147. Purks had spoken to Woods on the phone and told him that she did not think he had robbed them because Woods had been asking for money, and she was trying to appease him and keep him from doing "[s]omething more drastic than what he had done when he robbed [them]." T.150

However, when they went to the hospital to obtain medical treatment, the police were called by hospital personnel. T. 67, 145. Purks and Little gave descriptions of their assailants but did not inform the police that they recognized the sound's voice as the distinctive voice of petitioner whom they had known for number of years. T. 214, 216. Little admitted that he told the police that he could not identify any of the suspects and that he testified at the grand jury he could not see the assailants' faces clearly. T.78, 92. Little and Purks described a suspect who was shorter, darker-complected, and with a smaller build than petitioner. T.138, 43, 57, 162, 173, 180, 212. They told the police that Little's jewelry was taken but did not mention the robbery of Purks' jewelry.

Little stated that Woods called him from jail and said that when he got out, Woods told

Little that he was "going to step to [Little]" meaning that "he going [sic] to kill" him. T.127. When Little and Purks found out that Woods was in jail, they decided to report the incident to the police; they had not done so before because they were afraid of Woods. T.127, 147-48.

In the weeks following the robbery petitioner called Little and Purks on the phone because Little had been trying to get his property back from petitioner. T.150, 154, 177. In at least one of the phone calls, Purks stated that she knew that petitioner was not one of the robbers. T.154. She explained that she did that because she was afraid of petitioner. T.155. Purks admitted that he did not overtly threaten her on the phone but she was intimidated by his repeated calls. T.154. Woods did threaten to "spit in Verna's face because Verna had confronted [Woods'] mother about him robbing" Purks and Little. T.175. Verna was Little's sister. Woods also said he was going to "roll up on her ass," in reference to Verna. T.176. and Little testified that petitioner had been threatening them both over the phone and they were too afraid to accuse him until they knew that he was in jail.

After receiving a phone call from petitioner from jail about three months following the incident, Purks and Little decided to go to the police. In February 1997, they filed a criminal complaint against petitioner. They stated that they deliberately did not tell the police that they knew Woods was involved because he was a family member and they thought they could handle the matter on the own by speaking to him directly or to other relatives. T.101, 119, 124, 147, 173. For instance, Purks explained that her initial description of the suspect carrying the handgun (later identified as petitioner) was so different from petitioner's actual appearance saying that at the time, she "wasn't trying to implicate Arthur Woods in this robbery" because they "thought [they] could . . . be able to talk to him." T.161, 173.

The jury returned a verdict convicting petitioner three counts of robbery and one count of endangering the welfare of a child.. He was sentenced to a determinate term of imprisonment of 20 years on the first degree robbery conviction and two lesser concurrent sentences on the remaining connections. Petitioner's post trial motions set aside the verdict on the ground of alleged prosecutorial misconduct was denied prior to sentencing. On July 16, 2001 petitioner filed a motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440. 10, alleging that he was deprived of the effective assistance of counsel because his trial attorney did not place into evidence and audiotape memorializing it telephone conversations between perks and petitioner that the jury had heard during the trial. The motion court, who was **also** the trial court, denied the application on January 4, 2002, for procedural reasons stating that the matter was reviewable upon direct appeal. *See* N.Y. Crim. Proc. Law § 440.10(2)(c). The state court also denied the ineffective assistance claim on the merits. The Appellate Division subsequently denied leave to appeal.

On direct appeal, represented by new counsel, petitioner raised the following claims: (1) the verdict was against weight of the evidence that was not supported by legally sufficient evidence; (2) the prosecutor committed misconduct during summation; (3) the prosecution failed to present allegedly exculpatory evidence to the grand jury; and (4) the sentence was harsh and excessive. The Appellate Division, fourth department, of New York State Supreme Court, unanimously affirmed the judgment of conviction after reviewing all issues on the merits. *People V. Woods*, 288 A.D.2d 905. The New York Court of Appeals denied leave to appeal. *People v. Woods*, 97 N.Y.2d 734.

This timely habeas petition followed. Petitioner raises all the claims he raised on direct

appeal as well as the ineffective assistance of trial counsel claim asserted in the C.P.L. § 440. 10 motion. Respondent asserts that several the claims are not cognizable habeas review, procedurally defaulted, and, in any event, without merit. For the reasons that follow habeas relief is denied and the petition is dismissed.

## III.    Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.* § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523 (2000); *accord Harris v. Kuhlmann*, 346 F.3d 330, 342 (2d Cir.2003); *Clark v. Stinson*, 214 F.3d 315, 320 (2d Cir.2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. *Williams*, 529 U.S. at 412; *accord Sevencan v. Herbert*, 342 F.3d 69, 73-74 (2d Cir.2002), cert. denied, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable

manner to the facts of a particular case. *Williams*, 529 U.S. at 412-13. The inquiry for a federal

habeas court is not whether the state court's application of the governing law was erroneous or

incorrect, but rather whether it was "objectively unreasonable." *See id.* at 408-10; *Eze v.*

*Senkowski*, 321 F.3d 110, 125 (2d Cir.2003); *see also Aparicio v. Artuz*, 269 F.3d 78, 94 (2d

Cir.2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its

independent judgment, it would have decided the federal law question differently. The state

court's application must reflect some additional increment of incorrectness such that it may be

said to be unreasonable.").

Under AEDPA, "a determination of a factual issue made by a State court shall be

presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of

correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Parsad v.*

*Greiner*, 337 F.3d 175, 181 (2d Cir.) ("The presumption of correctness is particularly important

when reviewing the trial court's assessment of witness credibility."), *cert. denied sub nom.*

*Parsad v. Fischer*, 540 U.S. 1091, 124 S.Ct. 962 (2003). A state court's findings "will not be

overturned on factual grounds unless objectively unreasonable in light of the evidence presented

in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041

(2003).

**IV.     Analysis of the Petition**

> **A.     Ground One: The verdict was against weight of the evidence and the verdict
> was not supported by legally sufficient evidence**

> > **1.     Equal protection claim**

> Woods contends that he was deprived of the equal protection of the law because the

standard enunciated by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 309 (1979) is

"deficient when compared to New York's constitutionally based statutory laws [i.e., C.P.L. §§

70.10, 70.20][2] on reasonable doubt." Petitioner's Memorandum of Law ("Pet'r Mem.") at 12; *see*

*generally* at 10-31.

   In New York, when a defendant moves for a trial order of dismissal at the close of the

prosecution's case, the trial court is required to determine whether there is "legally sufficient"

evidence, as defined in C.P.L. § 70.10, to warrant submitting the case to the jury. *See*, *e.g.*,

*People v. Hines*, 97 N.Y.2d 56 (N.Y. 2001). The New York Court of Appeals has held that "the

trial court's determination of legal sufficiency should not be disturbed on appeal if it can be said

that "after viewing the evidence in the light most favorable to the prosecution, any rational trier

of fact could have found the essential elements of the [acts alleged] beyond a reasonable

doubt[.]" *People v. Conway,* 6 N.Y.3d 869, 872 (N.Y.2006) (quoting *People v. Santi*, 3 N.Y.3d

234, 246 (N.Y. 2004) (quoting *Jackson v. Virginia*, 443 U.S. at 319, and citing N.Y. Crim. Proc.

Law § 70.10(1)). "Ultimately, so long as the evidence at trial establishes 'any valid line of

reasoning and permissible inferences [that] could lead a rational person' to convict, then the

conviction survives sufficiency review[.]" *Id.* (quotations omitted)).

   Petitioner's argument is exhaustively researched and well presented. However, to the

extent that he claims a violation of New York's statutory law, such issues are not cognizable on

federal habeas review. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire,* 502 U.S. at 68. To the

---

[2]      C.P.L. § 70.10(1) states that "[l]egally sufficient evidence" means competent evidence which, if
accepted as true, would establish every element of an offense charged and the defendant's commission thereof;
except that such evidence is not legally sufficient when corroboration required by law is absent." N.Y. Crim. Proc.
Law § 70.10(1).

extent that he claims that New York's legal sufficiency standard is different than that set forth in

*Jackson*, the contention is without merit. As the New York Court of Appeals repeatedly has

stated, the courts in New York apply the same standard as set forth in *Jackson v. Virginia* for

judging whether a conviction is supported by legally sufficient evidence so as to ensure that the

conviction meets the minimum requirements of due process. *E.g.*, *Conway*, 6 N.Y.2d at 872

(quoting *Jackson*, 443 U.S. at 319); *see also Brooks v. Kelly*, No. 88-CV-0631E, 1993 WL

350188, at *2 & n.2 (W.D.N.Y. Sept. 10, 1993) (" However, the New York standard of review

for sufficiency of the evidence claims is 'functionally identical' to the federal standard of review

set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979).") (quoting *Hawkins v. West*, 706 F.2d 437,

440 (2d Cir.1983).

## 2.  Weight of the evidence

Woods attacks, in particular, the reliability of the identification evidence and argues that

because of the identifying witnesses' inconsistent stories and credibility problems, his conviction

was against the weight of the credible evidence. The Appellate Division rejected this claim on

the merits. *People v. Woods*, 288 A.D.2d at 906 (citation omitted).

Petitioner's "weight of the evidence" claim derives from New York Criminal Procedure

Law ("C.P.L.") § 470.15(5), which permits an appellate court in New York to reverse or modify

a conviction where it determines "that a verdict of conviction resulting in a judgment was, in

whole or in part, against the weight of the evidence." N.Y. Crim. Proc. Law § 470.15(5). Thus, a

"weight of the evidence" argument is a state law claim grounded in the criminal procedure

statute, whereas a legal sufficiency claim is based on federal due process principles. *People v.

Bleakley*, 69 N.Y.2d 490, 495 (N.Y. 1987). Since a "weight of the evidence claim" is purely a

matter of state law, it is not cognizable on habeas review. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. at 68 ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

In making a "weight of the evidence" argument, petitioner has not asserted a federal claim as required by 28 U.S.C. § 2254(a). Instead, he has raised an error of state law, for which habeas review is not available. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (habeas corpus review not available to remedy alleged error of state law). Because Hogan's claim attacking the verdict as against the weight of the evidence does not present a federal constitutional issue cognizable in a habeas proceeding, *e.g.*, *Ex parte Craig*, 282 F. 138, 148 (2d Cir. 1922) (holding that "a writ of habeas corpus cannot be used to review the weight of evidence . . ."), *aff'd*, 263 U.S. 255 (1923), it must be dismissed, *e.g.*, *Garrett v. Perlman*, 438 F. Supp.2d 467, 470 (S.D.N.Y. 2006) (dismissing claim that conviction was against the weight of the evidence; such a claim is not a basis for habeas relief but presents only an error of state law, for which habeas review is not available); *Douglas v. Portuondo*, 232 F. Supp.2d 106, 116 (S.D.N.Y. 2002) (same).

### 3. Sufficiency of the evidence

On direct appeal, the Appellate Division held that

Contrary to defendant's contention, the identification evidence is legally sufficient to support the conviction. The two robbery victims, each of whom had known defendant for a number of years and were familiar with his voice, identified defendant as one of the robbers by his voice (*see*, *People v Sylvester*, 247 AD2d 886, *lv denied* 91 NY2d 1013; *People v Greco*, 230 AD2d 23, 30, lv denied 90 NY2d 858, 940). In addition, an eyewitness, who also had known defendant for a number of years, made a visual identification of defendant as defendant ran away from the scene of the crime. The fact that the robbery victims chose not to identify defendant on the night of the incident "is not contrary to experience" and does not render their testimony incredible as a matter of law (*People v Ventura*, 171 AD2d 553, 555, *lv denied* 77 NY2d 1002). Bearing in mind that credibility issues are for

the jury to determine (*see*, *People v Malizia,* 62 NY2d 755, 757, *cert denied* 469 US 932), we conclude that there is a valid line of reasoning and permissible inferences that could lead a rational person to the conclusion reached by the jury (*see*, *People v Bleakley*, 69 NY2d 490, 495).

. . .

*People v. Woods*, 288 A.D.2d at 906.

A petitioner "bears a 'very heavy burden' in convincing a federal habeas court to grant a petition on the grounds of insufficient evidence." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir.2002) (citations omitted). The habeas court's inquiry is "whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt. In making this determination, [the court] must view the evidence in the light most favorable to the government, and construe all permissible inferences in its favor." *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.) (citations omitted), cert. denied, 462 U.S. 1108 (1983). *Policano v. Herbert*, 430 F.3d 82, 86 (2d Cir.2005) ("'[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254[,] . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.'") (quoting *Jackson*, 443 U.S. at 324). Even when "faced with a record of historical facts that supports conflicting inferences, [this Court] must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir.1994).

The habeas court's review of the jury's findings is limited, and a federal court will not grant habeas relief if "after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 318-19 (citations omitted) (emphasis in original). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable facts from basic facts to ultimate facts." *Id.* at 319.

Woods contends that "in order for the evidence to be considered sufficient, the prosecution must present at least some minimally reliable proof on the element of identification." Pet'r Mem. at 24 (Docket No. 1). Woods further argues that the voice identification testimony offered by Purks, Little, and Plenty's identification of "Boobie", fell short of "even that minimal level of reliability" and was "so unconvincing it necessitates a finding . . . that the jurors failed to accord the evidence its proper weight." *Id.* at 24-26. Woods characterizes that the victims' reason for not identifying petitioner at the time they initially spoke to the police as implausible and points to Little's and Plenty's criminal histories as reasons to reject their identification testimony.

Woods' attacks on the credibility of the witnesses do not provide a basis for overturning his conviction as it is well established that a court, sitting in habeas review, may not disturb the jury's findings with respect to the witnesses' credibility. *E.g.*, *United States v. Roman*, 870 F.2d 65, 71 (2d Cir.1989). The identifying witnesses were subject to extensive cross-examination on all of the issues surrounding their ability and opportunity to recognize Woods by his voice or by his appearance. Defense counsel exposed the not-insubstantial backgrounds of both the victim, Little, and Plenty, who identified Woods as he was fleeing the scene. He highlighted the inconsistencies in the victims' reports of how much jewelry and cash was stolen and argued the implausibility of their asserted reasons for waiting three months to report the incident and identifying Woods as the perpetrator.  This Court has reviewed the trial transcript in its entirety,

and the record is clear that defense counsel skillfully cross-examined the prosecution's witnesses and made arguments regarding their credibility in his summation; and the trial judge properly instructed the jury as the credibility of witnesses. Here, the jury weighed and ultimately found the testimony offered by Little, Purks, and Plenty to be credible. A federal habeas court must "resolve all issues of credibility[ ] in favor of the jury's verdict." *United States v. Reyes*, 157 F.3d 949, 955 (2d Cir.1998). *Huber v. Schriver*, 140 F. Supp.2d 265, 277 (E.D.N.Y.2001) ("[F]ederal habeas courts 'are not free to reassess the [fact-specific] credibility judgments by juries or to weigh conflicting testimony. . . . [A federal habeas court] must presume that the jury resolved any questions of credibility in favor of the prosecution.'") (quoting *Vera v. Hanslmaier*, 928 F.Supp. 278, 284 (S.D.N.Y.1996)); *accord Anderson v. Senkowski*, No. CV-92-1007 (CPS), 1992 WL 225576, at *3 (E.D.N.Y. Sept. 3, 1992), *affd*, 992 F.2d 320 (2d Cir.1993). A sufficiency claim therefore does not permit the reviewing court to redetermine the credibility or reliability of witnesses or substitute its view of the evidence for that of the trier of fact. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983); *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir.1996). This rule applies to credibility determinations made by juries with respect to identification testimony. *Vera v. Woods*, No. 06-CV-1684 (JFB), 2008 WL 2157112, at *9 (E.D.N.Y. May 21, 2008) (citing *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001)).

Under the circumstances of Woods' case, there is no basis to disturb the jury's finding. *Accord*, *e.g.*, *Vera*, 2008 WL 2157112, at *10 (citing *United States v. Valenzuela*, 722 F.2d 1431, 1433 (9th Cir.1983) ("With respect to identification evidence, the Due Process Clause protects solely an evidentiary interest . . ., an interest normally vindicated through the adversarial process of cross-examination. . . . The jury herein was advised of [the eyewitness'] inability to select

defendant from the photo spread and her failure to mention defendant's wrinkled face and balding condition when she described the bandit after the robbery. The admission of the in-court identification was not error.") (internal quotation marks omitted); *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir.1981) ("[T]he jury's decision was largely a matter of choosing whether to believe [the defense's] version of the events or to believe the version offered by the State. The jury chose to believe the State's witnesses . . . . We cannot say that no rational jury could have found guilt beyond a reasonable doubt on all the evidence."); *Williams v. Bennet*, No. 97 CIV. 1628(HB), 1998 WL 236222, at *5 (S.D.N.Y. Apr. 20, 1998) ("[Petitioner] relies on inconsistencies in his victim's trial testimony as compared to her statements to the police, the District Attorney's office and before the grand jury. These inconsistencies were placed before the jury by the defense, which made them a central focus of its case. The jury's decision to credit [the victim's] testimony, despite its inconsistencies, over [petitioner's] testimony, is fully supported by the record.")). Woods' challenge to the witnesses' credibility does not support a claim of legal insufficiency on habeas review in light of the Court's review of the entire record of this case.

**B.      Ground Two:          The prosecution failed to present allegedly exculpatory evidence to the grand jury**

Petitioner contends that the grand jury proceeding was defective because the prosecutor failed inform the jurors of certain exculpatory evidence–namely, that the witnesses originally described someone with a different appearance than petitioner and at first told the police that they could not identify any of the perpetrators, and that there were audiotape recordings of conversations in which one of the victims (Purks) told petitioner that she knew he had nothing to do with the robbery. Pet'r Mem. at 38-39 (Docket No. 1). On direct appeal, the Appellate

Division rejected this claim as unpreserved due his failure to move to dismiss the indictment, as well as without merit.

Respondent contends that the claim is unexhausted but procedurally defaulted and, in the alternative, is not cognizable on habeas review. Resp't Mem. at 7-8 (Docket No. 6). I agree with respondent that Woods' grand jury claim does not present a federal constitutional claim and, therefore, it cannot provide a basis for habeas relief. *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"). In *United States v. Mechanik*, 475 U.S. 66 (1986), in the context of an attack on a federal grand jury proceeding, the Supreme Court held that

> [T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

*Id.* at 70. Following the reasoning of *Mechanik*, the *Lopez* court held that "[i]f federal grand jury rights are not cognizable on direct appeal where rendered harmless by a petit jury, similar claims concerning a state grand jury proceeding are *a fortiori* foreclosed in a collateral attack brought in a federal court." *Lopez*, 865 F.2d at 32. *Lopez* and *Mechanik* require a finding that any alleged deficiency in the grand jury proceeding caused by the State's failure to present exculpatory evidence was cured by the petit jury's finding that he was guilty beyond a reasonable doubt. Furthermore, the petit jury had the opportunity to hear Purks' conflicting testimony and to listen to the audiotapes of the conversations between Purks and petitioner. This provides another basis for finding, as the appellate court did, that any defect caused by the prosecutor's omission at the

grand jury "was cured by defendant's use of the alleged exculpatory evidence at trial." *People v. Woods*, 288 A.D.2d at 906. For these reasons, Woods' claims relating to the grand jury proceeding must be dismissed.

### C. Ground Three: Prosecutorial misconduct during summation deprived petitioner of his due process right to a fair trial.

Woods asserts that the prosecutor committed misconduct during certain lines of questioning and also during his closing argument. On direct appeal, the Appellate Division held that there was "no merit to the contention of defendant that he was deprived of a fair trial by prosecutorial misconduct" because the trial court "properly sustained defendant's objections, struck the objectionable questions and comments, and issued an appropriate curative instruction, thereby eliminating any prejudice to defendant[.]" *People v. Woods*, 288 A.D.2d at 906, 732 N.Y.S.2d 806 (citations omitted). After reviewing the record in light of the pertinent Supreme Court precedent, I must agree that the state courts' rejection of Woods' claim of prosecutorial misconduct was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

"A criminal conviction 'is not to be lightly overturned on the basis of a prosecutor's comments standing alone' in an otherwise fair proceeding." *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir.1991) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)). For a claim of prosecutorial misconduct to suffice to establish a claim of constitutional error, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation and quotation marks omitted). "In order to reach the level of a constitutional violation, a

prosecutor's remarks must 'so infect the trial with unfairness as to make the resulting conviction a denial of due process.'" *Gonzalez*, 934 F.2d at 424 (quoting *Donnelly*, 416 U.S. at 643); *see also Bentley v. Scully*, 41 F.3d 818, 823 (2d Cir.1994). Thus, petitioner must demonstrate that he suffered actual prejudice from the prosecutor's remarks or actions. *See id.* The Second Circuit has outlined three factors to be weighed in assessing whether a petitioner has shown actual prejudice: (1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) the certainty of the conviction absent the prejudicial conduct (i.e., the strength of the prosecution's case). *Bentley*, 41 F.3d at 824; *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981) ("Often, the existence of substantial prejudice turns upon the strength of the government's case: if proof of guilt is strong, then the prejudicial effect of the comments tends to be deemed insubstantial; if proof of guilt is weak, then improper statements are more likely to result in reversal.").

First, on re-direct, the prosecutor questioned Purks about the bail-bonding business that she and Little operated on the side. *See* T.180-81. Defense counsel had elicited that information on cross-examination when he played audiotapes of certain telephone conversations for the jury. *See* T.113-15. When asked if she had ever posted bail for petitioner, Purks answered yes. The trial court sustained defense counsel's objection to the questions of what petitioner had been arrested for and how much money that she and Little had provided for bail. T.180-81. Defense counsel made a motion for a mistrial, and the trial court sustained the objection and instructed the prosecutor, "And don't go in [sic] it any more, Mr. LoTempio. Strike it from the record." T.181. The court did not provide a curative instruction at that time.

Petitioner also objects to the prosecutor's questioning of Purks about petitioner's

statement that he was going to "roll up on her ass," in reference to Little's sister. The jury heard that statement on the audiotapes played for the jury by defense counsel for the purpose of impeaching Purks about her claim to be afraid of petitioner and her identification of him as the robber. Specifically, on re-direct, the prosecutor asked Purks, "what does roll up on her ass mean[,]" T.177, in an attempt to elicit the nature of the threat, directed to Little's sister, perceived by Purks. Defense counsel's objection to form was sustained, and the prosecutor attempted to re-phrase the question twice more. The trial court sustained the objections. The prosecutor then asked, "Were you afraid that he was going to do a drive-by shooting on you?" T.177. Defense counsel's objection was sustained. T.177. The prosecutor asked, "Were you telling him you didn't think he did it [i.e., the robbery] because you were afraid he was going to do a drive-by shooting on your house?" T.177-78. The trial court sustained defense counsel's objection and instructed the prosecutor, "You can ask whether or not she - - she was in fear, but not what type of . . . ." T.178. At that point, the prosecutor dropped the foregoing line of questioning.

During summation, the prosecutor argued that Purks and Little "knew [petitioner's] history," "talked about bailing this defendant out of jail before." T.242. The trial court sustained defense's counsel's objection and struck the comment from the record. *Id.*

The prosecutor returned to the "drive by shooting" topic during summation, commenting, "You hear him [petitioner] telling how he's going to roll up on her ass. You heard it. I heard it. Now, if someone tells you they're going to roll up on your ass - - now, I know that recently in the Webster's dictionary drive-by shooting was included in there." T.247. The trial court sustained defense counsel's objection. The prosecutor commented, "Well, you decide what roll up on your

-19-

ass means. You decide that. And she tells you that she's afraid that they're going to drive by and shoot at her." T.247. Defense counsel objection, but before the trial court could rule, the prosecutor continued, "That's why she's afraid." T.248. The trial court sustained the objection. *Id.*

Later, in the context of acknowledging and attempting to minimize Little's criminal record and bail-bonding activities, the prosecutor commented, "Maybe he helps people get out of jail by giving them bond. Maybe he even set bail for this defendant in the past." T.251. Defense counsel objected and the trial court sustained the objection, struck the comment from the record, and instructed the prosecutor, "Please don't make any more references to that." *Id.*

Following summations, defense counsel moved for a mistrial, arguing that the prosecutor's objectionable questions and comments "were clearly prejudicial and can be serious enough to influence the jury during the course of deliberations." T.254. The prosecutor argued that it was "fair argument based on what was presented in the case and defense counsel's arguments" during summation. T.254. The trial court denied the motion without elaboration. *Id.* However, during its charge to the jury, the trial court issued the following instruction:

> There were certain objections made to the summation given by the district attorney which I sustained. I am directing you that you are not to consider any of those arguments that I sustained by . . . defense counsel when the district attorney was giving his summation. You are not to consider that at all. That is not part of this case.

T.256.

After reviewing the record in its entirety, the Court does not believe that this is a case where reversal of the conviction is warranted. The Court recognizes that improper prosecutorial remarks cannot be examined in a vacuum but rather comments must be reviewed in the context

of the entire trial, including the defense counsel's summation that preceded it. Improper

argument by the prosecution during closing statement is less likely to be found actually

prejudicial to the fairness of the trial where the defense summation invited the prosecution's

response. *See Darden*, 477 U.S. at 179 ("It is helpful as an initial matter to place [the

prosecution's] remarks in context. . . . The prosecutor's comments must be evaluated in light of

the defense argument that preceded it . . . ."). With regard to the questions to which defense

counsel objected, the Court notes that the prosecutor did attempt to rephrase the questions to put

them into a proper form. The Court recognizes that defense counsel did attack Little's credibility

based upon his criminal history and bail-bonding activities and argued that the audiotapes proved

that Purks was not really afraid of petitioner and believed that he did not rob them. However,

after his questions were found objectionable, the prosecutor therefore was on notice of the

impropriety of mentioning Little having possibly bailed petitioner out of jail, and attempting to

equate "roll up on her ass" with "drive by shooting". Although the prosecutor was entitled to

respond, he is not entitled to go beyond the bounds of fair comment, which happened here. *See*

*United States v. Young*, 470 U.S. 1, 13-14 (1985) (If the prosecutor's remarks were 'invited,' and

did no more than respond substantially in order to 'right the scale,' such comments would not

warrant reversing a conviction.' "). Here, although the prosecutor "did not do anything so

egregious as to comment on the defendant's failure to take the stand or the defendant's

invocation of his fundamental rights, he overstepped the bounds of proper summation,"

*Gonzalez*, 934 F.2d at 424, at Woods' trial. Fortunately, however, the trial court swiftly and

correctly sustained all of defense counsel's objections and struck the objectionable comments

from the record. The trial court also gave a specific and detailed instruction directing the jury not

to give any consideration to the improper comments made by the prosecutor during summation. The Court must presume that the jury heeded the trial judge's instructions regarding what they should and should not consider. *See generally Greer v. Miller*, 483 U.S. 756, 766 n. 8 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions.") (internal quotation marks and citation omitted); *see also Tankleff v. Senkowski*, 135 F.3d 235, 253 (2d Cir. 1998) ("[L]ooking at all the circumstances, we conclude that the standard instructions given by the trial court were probably sufficient to cure any harm that the prosecutor's misstatements may have caused."). Turning to the issue of "actual prejudice," I cannot say that "this is a case in which the evidence was so closely balanced that the prosecutor's comments were likely to have had a substantial effect on the jury," *Tankleff*, 135 F.3d at 253. In sum, although the prosecutor's remarks were improper, the Appellate Division's conclusion that they did not result in substantial prejudice to petitioner or deprive him of a fair trial was not an unreasonable application of clearly established federal law.

### D.    Ground Four:        Ineffective assistance of trial counsel

Woods attacks trial counsel's performance on the basis that he did not move into evidence the audiotape of telephone conversations between the complainants nd petitioner or obtain a transcript of the tapes, and thereby "conceded to and [sic] interpretation of the evidence that allowed the prosecutor to distort the significance of the tapes . . . ." Pet'r Mem. at 45. As noted above, the audiotapes of conversations between petitioner and the complainants were played for the jury by defense counsel during trial. Petitioner raised this claim in his collateral

motion to vacate the judgment, and the trial court denied it based upon C.P.L. § 440.10(2)(c). The court also found that it was without merit.[3]

As respondent argues, the trial court's reliance upon C.P.L. § 440.10(2)(c) in the circumstances of this case constitutes an adequate and independent state ground barring habeas review of Woods' ineffective assistance claim.  *See Sweet v. Bennett*, 353 F.3d 135, 139-40 (2d Cir. 2003) ("New York law requires a state court to deny a motion to vacate a judgment based on a constitutional violation where the defendant unjustifiably failed to argue the constitutional violation on direct appeal despite a sufficient record.") (citing, *inter alia*, *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir.1997)). Accordingly, the claim is procedurally defaulted for the purposes of habeas review. *See id.*  Woods "may avoid such a default as this by showing cause for the default and prejudice, or that failure to consider the claim will result in miscarriage of justice, i.e., the petitioner is actually innocent." *Id.* (citations omitted). On this record, I cannot discern any basis for excusing the procedural default. His contention that defense counsel entirely failed to investigate the tapes is not accurate, since defense counsel used them extensively at trial. Furthermore, the record belies his complaint that trial counsel, during his closing statement, did not "explain[ ] their significance in exonerating petitioner," Pet'r Mem. at 47. Defense counsel vigorously argued that the tapes proved that Purks and Little were lying about petitioner's

---

[3]     "Counsel used the taped conversations to discredit testimony of Little and Purks to the effect that they were frightened of the Defendant, to refute Little's denial of any involvement in an attempted burglary of the Defendant's home, and to adduce that Purks informed the Defendant that she knew he was not among the perpetrators. Neither the tapes, nor any other exhibit was placed in evidence by the parties. However, the record contradicts Defendant's assertion that the jury's inquiry relative to the date that the taped conversations occurred remained unanswered. The court informed the panel that there was no evidence in that regard. Based upon this record, the court finds that counsel for the Defendant provided meaningful representation. Although the tapes were an integral part of his trial strategy, counsel could have reasonably concluded that he reaped their full benefit during cross-examination. The Defendant does not contend that he would have benefitted from any portions of the tapes that were not played at trial." C.P.L. § 440.10 Order dated 1/4/02 at 3 (citation omitted; footnote omitted).

involvement in the robbery, and used the tapes to point out the dubious aspects of the complainants' characters. Woods has not explained how having the audiotapes placed into evidence probably would have resulted in a more favorable verdict, and he accordingly cannot show prejudice. Accordingly, Woods' fourth ground for relief is dismissed.

## V.    Conclusion

For the forgoing reasons, petitioner's motion for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing that he was denied a constitutional right, a certificate of appealability will not issue from this Court. *See* 28 U.S.C. § 2253(c)(2); *see also Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir.2000) (holding that substantial showing exists where (i) the issues involved in the case are debatable among jurists of reason or (ii) a court could resolve the issues in a different manner or (iii) the questions are adequate to deserve encouragement to proceed further).

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:      July 14, 2009
            Rochester, New York